In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3146

United States of America,

Plaintiff-Appellee,

v.

Brian W. Lea, a/k/a "Skip,"

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 99 CR 178--Charles N. Clevert, Judge.

Argued March 26, 2001--Decided May 2, 2001


   Before Flaum, Chief Judge, and Bauer and
Rovner, Circuit Judges.

   Flaum, Chief Judge.  After a business
relationship between Brian Lea and
National By-Products ("NBP") went bad,
pesticides from Lea's strawberry business
were dumped onto NBP's dead farm animals
("deadstock"). When an anonymous letter
informed NBP that its deadstock, which
had been rendered and sold as animal
food, had been contaminated, the company
was forced to shut down its Berlin,
Wisconsin plant and engage in a massive
recall. On September 14, 1999, Lea was
indicted and charged as the saboteur. At
trial, Lea claimed innocence, contending
that Barry Werch, a former NBP employee,
was the actual culprit. To that end, Lea
sought to introduce evidence of a
polygraph examination which Werch had
"failed," as well as "incriminating"
statements made by Werch to his wife. The
district court did not allow these pieces
of evidence to be admitted. On April 13,
2000, the jury found Lea guilty of
dumping the pesticides. Lea was sentenced
to 36 months imprisonment, a year of
supervised release, and ordered to pay
$2.2 million in restitution. Lea now
appeals, arguing that the district court
erred in excluding evidence of Werch's
polygraph examination and marital
communications. He further asserts that
these errors of exclusion operated to

violate his Sixth Amendment right to present a defense. For the reasons stated herein, we affirm the decisions of the district court.

I.   BACKGROUND

Up until the time of his conviction, Brian Lea was an entrepreneur dealing in animal remains. Lea owned and operated a mink ranch, an enterprise that sold meat to alligator farms and greyhound kennels, a deadstock pickup and removal business, an animal hide business, and a trucking business to transport his products. Lea also had concerns unrelated to animal carcasses, including a strawberry business. From 1991 through 1996, Lea had various dealings with NBP, a national corporation involved in the rendering business. NBP produced animal food and feed additives in the form of liquid fat and dry meat meal by processing otherwise wasted materials such as used restaurant grease, deadstock, and unused material from meat packing plants ("offal"). Lea and NBP developed a symbiotic relationship, whereby Lea sold his deadstock to NBP's Berlin, Wisconsin plant, and in return was leased space at that location to process his chicken offal into mink food.

The relationship between Lea and NBP began to deteriorate in August of 1996, when NBP stopped leasing Lea space in its Berlin plant to process his chicken offal. In response, Lea ceased to vend his offal and collected deadstock to NBP, and instead marketed his products to a competitor of NBP. In order to recoup the raw materials lost by Lea's actions, NBP created its own deadstock collection business. NBP aggressively competed with Lea for deadstock, hiring Lea's drivers, conducting promotions to attract business, and paying for deadstock--a frowned-upon tactic in the deadstock removal field. The competition upset Lea and took a heavy toll on him financially, eventually resulting in his filing for bankruptcy.

In the early winter of 1996, Lea informed his employee, Jason Haynes, that he had dumped pesticides from his strawberry business into a NBP offal and deadstock trailer in Eau Claire, Wisconsin. Lea stated that his "only mistake" was that he had dropped his

flashlight between the loading dock and the trailer and could not retrieve it. That flashlight, which was eventually recovered by NBP employees, was identified as the model of flashlight that had been purchased by Lea's company in November of 1996. Lea also showed Haynes a letter he intended to send to the Berlin Police Department, detailing the act of contamination.

On December 28, 1996, the Berlin Police Department received an anonymous letter from a supposed former NBP employee recounting an act of sabotage against the NBP Berlin plant. Enclosed with the letter was a sample of the contaminant used by the perpetrator. Upon notification of the contamination, NBP stopped delivery of its products. When testing of those products revealed that pesticide contamination had in fact occurred, NBP shut down its plant and began a massive recall. According to NBP's chief financial officer, the shutdown and recall cost NBP and its insurer over $2.5 million.

For obvious reasons, the investigation into the contamination initially focused on former NBP employees. On January 15, 1997, one such individual, Barry Werch was questioned by the United States Food and Drug Administration ("FDA") agent handling the matter. In that interview, Werch described the working conditions at NBP, relating that maggots crawled from the ceiling of the NBP plant. According to the agent, during the course of that interview Werch provided contradictory statements regarding his knowledge of when the tampering had taken place and his feelings towards NBP. The following day, Werch agreed to take a polygraph examination. Special Agent Robert West conducted the test, wherein Werch was asked whether he had put pesticides into NBP's raw materials and whether he had mailed the aforementioned letter to the Berlin Police Department. Based on Werch's responses, West classified Werch as "deception indicated," meaning that Werch had scored a minus three on at least one of the questions./1 Under normal circumstances, West conducts a post-examination interview with the testee in order to ascertain the basis for the deception. However, an angered Werch did not allow the post-instrument phase of the test to proceed, as he

stormed out of the testing room.

On May 14, 1997, a second letter was received by the Berlin Police Department in which the author claimed responsibility for an additional contamination of NBP materials. That message warned that "a very major finished product contamination will occur on July or August so the world can see the putrid conditions that exist there at that time when the maggots crawl the walls and ceilings and the stench is so bad that you can cut it with a knife." Because Werch had mentioned maggots crawling on the walls during his first interview with the FDA agent, and because of similar statements which Werch had made to his then spouse, the agents considered him as a possible author of the letter.

Nonetheless, as the investigation proceeded, the authorities began to focus on Lea as a suspect. The pesticides used in the contamination were tied to Lea (via his strawberry business), as were the letters claiming responsibility for the acts. On September 14, 1999, Lea was indicted by a grand jury in the Eastern District of Wisconsin and charged with two counts of violating 18 U.S.C. sec. 1365(b). Count One of the indictment alleged that in December of 1996, Lea had caused serious injury to NBP by tainting "animal by-products, which were intended as a component of animal food and which affected interstate commerce." Count Two charged that in mid-1997, Lea had caused serious injury to NBP by tainting restaurant grease, which was to be utilized by the company in making animal food.

At trial, Lea sought to defend himself by submitting evidence of third-party (Werch) culpability. Lea submitted a request to the court to call West to testify as to the results of Werch's polygraph examination. The district court conducted a telephone hearing with West, and thereafter, in a written order dated April 6, 2000, denied Lea's request. In its decision, the court noted that "the defense [had] failed to establish the reliability of West's opinion resulting from his polygraph examination of Werch." Specifically, the court focused on the fact that West could only speculate as to the accuracy of the polygraph examination

he had performed, and could not state whether there were any known statistics on the accuracy rate of the methodology employed in examining Werch.

On April 11, Lea called Heidi Werch, Barry Werch's ex-wife, to testify. Lea sought to question Heidi regarding a conversation she had with her husband during their marriage. According to Lea, Barry Werch had complained to his wife about the working conditions at NBP and specifically about the presence of maggots in the plant. Lea had hoped to have this testimony introduced to connect Barry Werch to the May 1997 letter, and thus bolster his third-party culpability defense. However, Barry Werch invoked the marital communications privilege, and the district court did not allow Heidi Werch to answer Lea's questions.

Two days later, on April 13, 2000, the jury returned a verdict of guilty against Lea on Count One and not guilty on Count Two. Thereafter, Lea filed a motion for judgment of acquittal. On July 28, 2000, the district court orally denied Lea's motion, and sentenced him to 36 months incarceration, followed by one year of supervised release. Lea was further ordered to pay a special assessment of $100 and restitution of $2.2 million. Lea now appeals the evidentiary rulings of the district court. Besides contending that the results of the polygraph examination were incorrectly excluded and that the marital communications privilege was incorrectly applied, he propounds that these errors operated to violate his Sixth Amendment right to present a defense.

II.  DISCUSSION

A.  Admissibility Of Polygraph Examination Results

As stated above, Lea filed a pretrial motion seeking permission to call Agent West to testify as to the results of Werch's polygraph examination. On April 6, 2000, the district court conducted a telephone hearing with West in order to determine whether West's testimony was admissible consistent with the gatekeeping test enunciated in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). In a written order that

same day, the court noted that "[i]n considering the reliability of proffered scientific testimony [here, Werch's polygraph examination], the court mustdetermine whether the proffered theory or technique has been tested, whether the theory or technique has been subjected to peer review and publication, the known or potential error rate of the technique or expert, and whether the theory at issue has gained 'general acceptance' in the relevant scientific community." The court further noted that the Seventh Circuit regards the admission of polygraph evidence as within the discretion of the district court, which is required to engage in a Fed. R. Evid. 403 balancing test./2 Turning to the testimony at issue, the court observed that West could only speculate as to the accuracy of the polygraph examination he performed, and was unaware of whether there were any known statistics on the accuracy rate of a test using the methodology employed in examining Werch. Concluding that the defendant had failed to establish the reliability of West's opinion, the district court did not allow the evidence to be admitted at trial.

On appeal, Lea asserts multiple foundations for considering the district court's exclusion of West's testimony to be in error. First, Lea contends that the district court incorrectly analyzed the admissibility question by proceeding under a Daubert framework, as the Seventh Circuit has articulated that such inquiries are to be handled under a Rule 403 balancing of probative value versus prejudicial effect. Alternatively, Lea posits that if a Daubert examination was appropriate, the district court's application of the Daubert gatekeeping test was unsound. We begin by examining the appropriate method for determining the admissibility of polygraph evidence.

As the Supreme Court has noted, "there is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques." United States v. Scheffer, 523 U.S. 303, 309 (1998)./3 In this Circuit, the admissibility of polygraph evidence is a matter within the discretion of the district court. See United States v. Robbins, 197 F.3d 829, 844 (7th Cir. 1999). A district court's

decision on the admissibility of polygraph results deserves considerable deference, and will be reversed only when the district court has abused its discretion. See United States v. Olson, 978 F.2d 1472, 1480 (7th Cir. 1992). "When dealing with the admissibility of polygraph evidence, and the accuracy thereof, the trial court must engage in a delicate balancing of many factors including probative value, prejudicial effect, confusion of the issues, misleading the jury, and undue delay." Id. As such, in Robbins we noted that "[i]n determining whether to admit polygraph evidence, the district court must take as its guide Rule 403 of the Federal Rules of Evidence." 197 F.3d at 844.

Building on the language in Robbins, Lea suggests that the Seventh Circuit has determined that lie detector examinations should not be excluded because of reliability concerns. Rather, he argues that only the concerns listed in 403 can serve as reasons for exclusion. An examination of Seventh Circuit case law does suggest that we have progressed farther than other courts in allowing the admission of polygraph evidence./4 Yet, despite the veracity of Lea's contention regarding the applicability of 403, a district court need not abandon its reservations regarding the reliability of polygraph procedures. In United States v. Dietrich, we noted that while the decision whether to admit polygraph evidence was left to the discretion of the district court, district judges often excluded such evidence "because doubts about the probative value and reliability of this evidence" outweighed any rationale for admission. 854 F.2d 1056, 1059 (7th Cir. 1988) (emphasis added).

While our recent case law has not explicitly retained the notion that reliability concerns can factor into the admissibility decision, we note that Rule 403 allows for the exclusion of otherwise relevant evidence if the probative value is "substantially outweighed by the danger of . . . misleading the jury." As Justice Thomas's majority opinion in Scheffer noted, "[a] fundamental premise of our criminal trial system is that 'the jury is the lie detector.'" 523 U.S. at 313 (quoting United States v. Barnard, 490 F.2d 907, 912 (9th Cir. 1973)).

Jurisdictions may be legitimately concerned that juries might be misled, and give "excessive weight to the opinions of a polygrapher, clothed as they are in scientific expertise . . . ." Id. at 313-14. Justice Thomas furthercommented that "the aura of infallibility attending polygraph evidence [could] lead jurors to abandon their duty to assess credibility and guilt." Id. Such concerns are undoubtedly heightened when the reliability of the particular examination is called into question. As the reliability of the evidence decreases, the likelihood increases that the probative value may be substantially outweighed by the prejudicial effect. Thus, while reliability is an explicitly referenced concern that is appropriately discussed in a Daubert framework, the issue may also become an integral part of a 403 inquiry.

Consistent with the above analysis, in United States v. Taylor, we found that a district court had not abused its discretion in excluding evidence of a polygraph examination because it determined that the expert's application of the technique in the case was not reliable. 154 F.3d 675, 683 (7th Cir. 1998). The court had examined the reliability concerns under the Daubert framework, and determined that the "reliability problems rendered the probative value minimal . . . [while] there was a danger that the jury would consider the polygraph test to be conclusive regarding [the witness'] veracity." Id. In affirming the decision of the district court, we examined the testimony's reliability using concerns outlined in Daubert, including the methodology employed and the qualifications of the expert. See id; Daubert, 509 U.S. at 590-95. However, our ultimate conclusion was that the concerns regarding reliability tipped the 403 analysis in favor of excluding the polygraph evidence.

We read the district court in this case to have proceeded in a similar vein. While the district court did repeatedly reference its obligation under Daubert, it noted that it was required "to engage in a delicate balancing of many factors including probative value, prejudicial effect, confusion of the issues,

misleading the jury, and undue delay." Against that backdrop, the district court focused on the known or potential rate of error. Looking towards Daubert as a guide, the court was concerned with West's inability to conclusively provide the accuracy rates for the polygraph examination he conducted. More troubling to the court were the facts that West was (1) unaware as to whether there were any known statistics on the accuracy rate of the test he had given, and (2) unable to complete his examination of Werch and determine why it was that he had considered Werch "deception indicated."/5 These factors reduced the reliability of West's opinion, tipping the balance under Rule 403 in favor of exclusion.

As stated above, we afford district courts a great deal of discretion in deciding whether to admit polygraph evidence. See Olson, 978 F.2d at 1480. Here, the district court had legitimate concerns regarding the reliability of the examination performed. The court attempted to assuage its concerns by conducting a hearing with Agent West. When West was unable to allay the district court's uneasiness regarding reliability, the court concluded, as Rule 403 permits, that the evidence should be excluded. Accordingly, we find that the district court did not abuse its discretion in excluding West's testimony regarding Werch's polygraph examination. As such, we continue to hold that a district court need not conduct a full Daubert analysis in order to determine the admissibility of standard polygraph evidence, and instead may examine the evidence under a Rule 403 framework. Nonetheless, we posit that the factors outlined by the Supreme Court in Daubert remain a useful tool for gauging the reliability of the proffered testimony, as reliability may factor into a 403 balancing test./6

B.  Applicability Of The Marital Communications Privilege

On January 30, 1997, Heidi Werch met with Agent Hejny of the FDA. Hejny questioned Heidi as to whether Barry Werch had ever spoken ill of NBP. Heidi recalled to the agent that one day during the course of their marriage, Barry had returned home quite upset. Barry informed

Heidi that a grinder at the plant had broken down and that he had been required to go in and fix it. While inside the grinder, Barry said, there were maggots dropping all over him.

At trial, Lea sought to call Heidi to testify to the statements made by Barry concerning the maggots at the NBP plant. Lea attempted to introduce the testimony to bolster his claim that Barry Werch was the author of the May 14th letter--which likewise referenced maggots at the plant--and thus the culpable party. However, Barry Werch's counsel invoked the marital communications privilege, and the court instructed Heidi not to respond to any of Lea's questions. Lea argues on appeal that the decision of the district court to allow Barry Werch to invoke that privilege was in error. Lea asserts that Barry Werch waived the privilege during an interview with the FDA, wherein he mentioned maggots at the NBP plant.

In a criminal trial, the availability of any privilege is "governed by the principles of the common law as they may be interpreted by the Courts of the United States in the light of reason and experience." Fed. R. Evid. 501; United States v. Byrd, 750 F.2d 585, 589 (7th Cir. 1984). One privilege that is firmly rooted in our common law is the marital communications privilege, which reflects the value our society places on uninhibited communications between spouses. See United States v. Short, 4 F.3d 475, 487 (7th Cir. 1993). The privilege, which can be asserted by either spouse, applies only to communications made in confidence between the spouses during a valid marriage. See Byrd, 750 F.2d at 590. We encourage married people to confide in each other by protecting their statements from later scrutiny in court. See id. In order to fully foster this level of trust between married couples, the Supreme Court has held that a couple's divorce does not terminate the privilege for confidential marital communications. See Pereira v. United States, 347 U.S. 1, 6 (1954). Yet, the cost of that privilege is a reduction in truthful disclosure. It is because privileges are in derogation of the search for truth, which lies at the heart of a criminal trial, that the Supreme Court has held that they must be construed narrowly. See United States v.

Nixon, 418 U.S. 683, 710 (1974).

Once again, special deference is given to the evidentiary rulings of the district court. Thus, we will not reverse such rulings unless the decision of the district court constituted an abuse of its discretion. United States v. Lofton, 957 F.2d 476, 477 (7th Cir. 1992). Here, the district court stated that it did "not have any reason to believe that the communication was intended to be communicated to third parties, or that the privilege was waived at any point in time." When analyzing whether the district court properly invoked the marital communications privilege to bar testimony, we begin with a premise of confidentiality regarding communications made during a marriage. Blau v. United States, 340 U.S. 332, 333 (1951). Simply put, Lea has not presented any evidence to overcome this presumption./7 Despite Lea's assertion, the record does not reflect that the statements made by Barry Werch to Heidi Werch were "categorically and literally identical" to those statements Werch provided FDA agents. Rather, both statements merely dealt with a similar topic, namely maggots in the NBP. While we remain steadfast in our position that the necessary element of confidentiality is lost when a spouse divulges to a third party the communication which he or she seeks to exclude from evidence, see Short, 4 F.3d at 478, we do not believe that to have occurred in this instance. Thus, we conclude that there was no abuse of discretion in the district court's decision to exclude these statements as having been made in the absolute confidence of a valid marriage./8

C.  Opportunity To Present A Defense

Apart from the evidentiary challenges discussed above, Lea argues that the Constitution mandates that both the testimonies of Agent West and Heidi Werch should have been admitted. Specifically, Lea asserts that the district court's decisions to exclude that evidence constitutes a violation of Lea's Sixth Amendment right to present a defense.

We begin by noting that the right of a defendant to present evidence is grounded in the Sixth Amendment, and stands on no lesser footing than the other Sixth

Amendment rights. See Taylor v. Illinois, 484 U.S. 400, 409 (1988). Just as the accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, the accused also has a right to present his or her own witnesses to establish a defense. See Washington v. Texas, 388 U.S. 14, 19 (1967). However, a defendant's right to present relevant evidence is not unbounded, but rather is subject to reasonable restrictions. See Scheffer, 523 U.S. at 308. Thus, a defendant's interest in presenting relevant evidence may "'bow to accommodate other legitimate interests in the criminal trial process.'" Rock v. Arkansas, 483 U.S. 44, 55 (1987) (quoting Chambers v. Mississippi, 410 U.S. 284, 295 (1973)). "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. The Compulsory Process Clause provides him with an effective weapon, but it is a weapon that cannot be used irresponsibly." Taylor, 484 U.S. at 410. Under the Constitution, state and federal rulemakers have broad latitude to fashion rules which operate to exclude evidence from criminal trials. See Scheffer, 523 U.S. at 308. Such rules will not be deemed to abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." Rock, 483 U.S. at 56.

The evidence that Lea argues should have been introduced in keeping with the Sixth Amendment right to present a defense is evidence which we have already determined is in one instance "privileged" and in the other "inadmissible under standard rules of evidence." See Taylor, 484 U.S. at 410. In light of those findings, in order to be successful on his Sixth Amendment claim, Lea would have to put forth that the rules which guided those decisions violate the standards set forth in cases such as Rock. See id. In this instance, that would require Lea to argue that Federal Rule of Evidence 403 and the marital communications privilege were arbitrary or disproportionate to the purposes they were designed to serve. Lea does not undertake that endeavor, and we believe he is wise in not doing so. Therefore, we find that the district

court's decisions, to the extent that they operated to limit Lea's ability to present evidence of Werch's supposed culpability, did not violate Lea's Sixth Amendment Right to Compulsory Process.

III.  CONCLUSION

The district court did not abuse its discretion in excluding West's testimony regarding Werch's polygraph examination. Likewise, the court did not err in finding that the marital communications privilege had been properly invoked. Fur thermore, these decisions did not constitute impermissible restrictions on Lea's Sixth Amendment right to present a defense. For the foregoing reasons, we Affirm the decision of the district court.

FOOTNOTES

/1 During a hearing on the matter, West did not have his files with him and could not recall on which question Werch had received the minus three score. However, he stated that to be considered "deception indicated" for the entire examination, which Werch was, one must receive a minus three score on at least one question.

/2 Rule 403 reads as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consid- eration of undue delay, waste of time, or need- less presentation of cumulative evidence.

/3 Recent cases from both the Supreme Court as well as this Circuit have examined the literature on the issue of the accuracy and reliability of polygraph examinations. See Scheffer, 523 U.S. at 309; Veazey v. Communications & Cable of Chicago, Inc., 194 F.3d 850, 855-59 (7th Cir. 1999). While we need not rehash the studies on the subject at this time, we note generally, as the Supreme Court did in Scheffer, that while "[s]ome studies have concluded that polygraph tests overall are accurate and reliable . . . [o]thers have found that polygraph tests assess truthfulness . . . little better than could be obtained by the toss of a coin." 523 U.S. at 310.

/4 While this Court would allow a district court to admit polygraph evidence if it complied with Rule 403, other federal circuits and states have maintained a per se ban on the admissibility of such evidence. See, e.g., United States v. Sanchez, 118 F.3d 192, 197 (4th Cir. 1997); State

v. Porter, 241 Conn. 57, 92-95 (1997); People v. Gard, 158 Ill.2d 191, 202-04 (1994).

/5 West could not even inform the court as to which question(s) Werch had received the score required to be considered "deception indicated."

/6 Because we have determined that the district court properly excluded the evidence pursuant to Rule 403, we need not address Lea's contention that the district court's application of Daubert was unsound. However, we note in passing that it would not have been error had the district court conducted a full Daubert analysis of West's testimony. We undertake a de novo review of whether the district court properly applied Daubert. See United States v. Brumley, 217 F.3d 905, 911 (7th Cir. 2000). West's examination of Werch involved deviations from the standard "pass," "fail," or "inconclusive" grades. West employed a methodology which he had never presented in a federal court. Furthermore, the test itself was never completed, as Werch did not partake in the post-examination phase of questioning. These departures from the standard polygraph examination could have raised sufficient doubts as to accuracy and reliability of the test at issue so as to warrant the district court's engagement in a complete analysis of West's polygraph examination as well as his credentials. See Daubert, 509 U.S. at 590-95.

   As for the examination conducted by the district court, it is evident that it could be considered an appropriate Daubert analysis. A district court is not required to consider all of the guideposts outlined in Daubert when making an admissibility ruling. Ancho v. Pentek Corp., 157 F.3d 512, 515 (7th Cir. 1998). Here, the district court focused on the potential rate of error prong of Daubert, and concluded that the evidence should be excluded as unreliable. Having determined that the district court properly applied the Daubert framework, the decision to admit or exclude expert testimony would be reviewed for abuse of discretion. See Brumley, 217 F.3d at 911. As we held above, we believe, given the circumstances surrounding this evidence, the district court's decision to exclude would not be reversible under our deferential standard of review. Thus, regardless of whether analyzed under Rule 403 or independently under Daubert, the district court did not err in excluding this evidence.

/7 Lea's entire argument that Barry Werch waived the marital communications privilege is two sentences long and does not reference any relevant case law. As we noted in United States v. Andreas, such perfunctory and underdeveloped arguments are

themselves waived. 150 F.3d 766, 769-70 (7th Cir. 1998). However, as in United States v. White, 240 F.3d 656, 662 n.4 (7th Cir. 2001), we grant Lea a degree of latitude and examine the merits of his claim.

/8 Notwithstanding the above discussion, we note that if any error existed, it would be considered harmless. See Lofton, 957 F.2d at 477-78. First, as Lea admits, he was able to introduce evidence of Barry Werch's status as a suspect. Second, Heidi Werch's testimony was at best tangentially relevant for proving that Lea authored the May 1997 letter. Yet, most importantly, that letter referenced the act of contamination contained in Count Two of the indictment. Because Lea was found not guilty of that charge, it is difficult to see how Lea was harmed by the district court's exclusion of evidence relating to that Count.