**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Samuel T. TAYLOR, Defendant–Appellant.**

---

UNITED STATES of America,
Plaintiff–Appellee,

v.

Samuel T. TAYLOR, Defendant–
Appellant.

Nos. 97–1004, 98–1120.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 15, 1997.

Decided Aug. 26, 1998.[1]

1. Appeal No. 97–1004 was argued on September 15, 1997. Appeal No. 98–1120 was later assigned to this panel under Operating Procedure 6(b). We determined that oral argument was unnecessary in the appeal and proceed to decide it on the briefs.

Kenneth M. Hays (argued), Office of the United States Attorney, South Bend, IN, for Plaintiff–Appellee in No. 97–1004.

Jon E. DeGuilio (submitted), Office of the United States Attorney, Dyer, IN, William T. Grimmer, Office of the United States Attorney, South Bend, IN, for Plaintiff–Appellee in No. 98–1120.

Douglas M. Grimes (argued), Gary, IN, for Defendant–Appellant.

Before POSNER, Chief Judge, CUMMINGS and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

A grand jury indicted Samuel Todd Taylor for possession of more than five grams of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and for being a felon in possession of firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). After separate trials before separate juries, Taylor was convicted of both counts and has appealed the convictions. We have consolidated these appeals because they involve overlapping issues and now affirm both convictions.

## I.

Taylor's arrest and convictions stem from a search of 1614 S. Fellows St., where police found firearms and crack cocaine. The officers obtained a search warrant for the residence based on a controlled purchase by a confidential informant as well as statements from other informants that indicated narcotics-related traffic at that residence. Surveillance confirmed the drug traffic at the residence and police executed the warrant in the early morning, finding Taylor asleep with his girlfriend Sheila Gaston. In the bedroom where the pair were found sleeping, the police observed a padlocked closet. Inside the closet, they found men's clothing and cologne, a receipt with Taylor's name on it, a shotgun, semi-automatic handguns, and ammunition. No women's clothing was found in the closet. Men's walking shorts were found next to the bed, and in the pockets, police found a pager registered to Taylor, a wallet containing Taylor's identification, $805 in

cash, and a clear plastic baggie containing crack cocaine. In the house, police found a number of items associating Taylor with that residence, including a driver's license, a vehicle title certificate, and a hospital billing statement for him with that address. The officers later established that the defendant's pager and his health insurance were obtained with that address listed as his residence. On the morning of the search, Ms. Gaston made a videotaped statement to the police confirming that Taylor lived there, that the walking shorts belonged to him, and that she had seen him recently in possession of crack cocaine and believed crack was sold out of the house. Taylor denied that the drugs or guns were his and claimed that he did not reside there.

A grand jury subsequently returned a two count indictment against Taylor for possession with intent to distribute and for being a felon in possession of a firearm. The district court granted his request for separate trials on the two counts before separate juries. Prior to each of the trials, Taylor moved to quash the indictment and the search warrant, and to suppress the evidence seized from the residence. The district courts denied those motions. A jury convicted him on the firearms count, but the first trial of the crack cocaine count resulted in a hung jury. A second trial on that count resulted in a conviction. Taylor now appeals his convictions to this Court.

## II.

On appeal, Taylor raises a myriad of issues, none of which entitle him to relief. Some relate to both convictions and some to one of the trials. We will address the issues common to both convictions first.

### A.

■■■ First, with respect to both convictions, Taylor argues that the police lacked probable cause for obtaining the search warrant. He asserts that the affidavit which formed the basis for the warrant lacked indicia of reliability. The facts of record belie that argument, and support the magistrate's determination of probable cause. In order to find probable cause for a search warrant, the

magistrate need only find that the totality of the circumstances demonstrates a "fair probability that contraband or evidence of a crime will be found." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). On review, we must uphold that determination if the magistrate had a " 'substantial basis for ... conclud[ing]' that probable cause existed." *Id.* (*citing Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)). In the instant case, the magistrate judge issued the warrant based upon an affidavit submitted by Officer Dennin. That affidavit stated, in pertinent part, as follows. Officer James A. Dennin received information from both known and anonymous sources that narcotics were being sold from the residence. The police received complaints that Taylor was selling narcotics from that residence since 1991. The complaints described the narcotics traffic at that house. Furthermore, Dennin and other officers verified the type of traffic described by the complainants during surveillance of the house. Finally, a confidential informant told Dennin that he could purchase crack cocaine from Taylor at that residence, and subsequently made a controlled purchase of crack cocaine at that residence under the surveillance of Dennin. After making the purchase, the confidential informant gave the crack cocaine to Dennin. Considering the totality of the circumstances, that information is certainly sufficient to demonstrate a fair probability that contraband would be found at the residence. The magistrate thus did not err in issuing the search warrant, and the district court properly denied Taylor's motions to quash the search warrant and suppress the evidence.

### B.

■■■ In a related claim, Taylor contends that the district court erred in limiting the scope of cross-examination during a *Franks* hearing held to determine the veracity of the affidavit. A *Franks* hearing is proper where the defendant has made a substantial preliminary showing that an affiant, in obtaining a search warrant, included deliberately false material statements, or recklessly disregarded the truth. *Franks v. Delaware*, 438 U.S.

154, 170–171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). That showing is not met by mere conclusory statements. *Id.* In this case, Taylor provided only conclusory assertions that the allegations in the affidavit were false. He provided no evidence other than his own self-serving statements. In an excess of caution, the district court conducted an evidentiary hearing to enable Taylor to develop his *Franks* argument, but treated the hearing as one to determine whether the preliminary showing could be met. Because the affidavit submitted by Taylor was insufficient to raise any inference that the Dennin affidavit was false, the district court was not required to hold any hearing at all. Therefore, any limits placed upon cross-examination at that hearing are not problematic.

■ Moreover, even if a *Franks* hearing had been required, the limits placed upon the cross-examination were proper efforts to focus the questioning on relevant lines of inquiry. The questions precluded by the judge addressed circumstances unrelated to the statements in the Dennin affidavit, or involved a rehashing of points that Taylor had already made. For example, Taylor repeatedly attempted to establish that the $20 bill used by the confidential informant in the controlled purchase was not found in the subsequent search of the residence. He argued that discovery of the $20 bill at the residence would have confirmed that the controlled purchase actually occurred, but that its absence established that the purchase never took place. This argument is a stretch given that the search occurred two days after the controlled purchase. Because the absence of the $20 bill at that time was not probative of Dennin's truthfulness in relation to the controlled purchase, the district court was correct to limit the testimony. Moreover, the questioning had already yielded the fact that the $20 bill was not found, so further inquiry was repetitive and was properly refused.

■ Taylor also complains that the district court refused to allow him to subpoena the magistrate who issued the warrant. Taylor provided to the district court a Verified Offer of Proof regarding the testimony he hoped to obtain from the magistrate judge. In essence, the Offer of Proof stated that the magistrate judge would testify that he believed the allegations in Dennin's affidavit and issued the warrant based upon those allegations. That testimony adds nothing to the question of whether Dennin recklessly submitted an affidavit containing false statements. Because the magistrate judge's testimony was irrelevant to the fundamental issues regarding the truth or falsity of the affidavit and Dennin's state of mind, the court properly refused that request. Therefore, the court did not err in limiting the scope of the evidentiary hearing, and in fact provided Taylor with a more extensive opportunity to develop his argument than the law would require.

### C.

■ The defendant next complains that the grand jury indictment was fundamentally flawed and should have been quashed. Toward that end, he argues that the government improperly introduced evidence of his gang affiliation, and that the indictment was based solely on hearsay.[2] The testimony regarding the gang affiliation came at the initiation of a grand juror during the questioning of the witness:

JUROR: So is this the Sammy Taylor of Dawg Life?[3]

MR. GRIMMER (Asst.U.S.Atty): Let me—Why don't you answer that. Go ahead and answer the question.

WITNESS: Yes, it is.

JUROR: Does this disarm that situation somewhat or—

MR. GRIMMER: I—Let me—Let me—Let me go into that. First of all, the record should be clear that there is—the record should be clear that there is an investigation being conducted into a group called Dawg Life; and this agent has testified as to that investigation.

---

2. The hearsay challenge was presented in appeal 98–1120 but not 97–1004, so our disposition of this issue is relevant only to 98–1120.

3. Dawg Life is a gang.

As to the evidence with respect to this particular indictment, you must find probable cause as to the-the charges here based upon the evidence that's been presented to you here today. And the fact that simply there is allegations that Mr. Taylor is involved in Dawg Life simply remain that. And I guess what you're hearing here today is testimony from a search warrant.

Transcript of Grand Jury Proceedings, April 4, 1996, at 22–23. Taylor argues that this colloquy so tainted the proceedings that the court was required to quash the indictment. We need not consider whether allowing a reference to gang affiliation was error because the reference was harmless. Because a petit jury returned a conviction on both counts, any such errors in the presentation of evidence to the grand jury are harmless as a matter of law.[4] *United States v. Anderson,* 61 F.3d 1290, 1297 (7th Cir.1995).

Taylor attempts to avoid this result by arguing that the error affected the structural integrity of the proceedings, and violated his right to equal protection under the Fourteenth Amendment. He analogizes to *Vasquez v. Hillery,* 474 U.S. 254, 264, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986), in which the Supreme Court held that the systematic exclusion of African–Americans from a grand jury affected the structural integrity of the grand jury and thus was not subject to the harmless error standard. *But see United States v. Mechanik,* 475 U.S. 66, 70 n. 1, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) (limiting *Vasquez* reasoning to that unique situation of racial discrimination in the structure of the grand jury). His argument is unclear at best. He apparently contends that the attribution of gang membership to him exacerbates racial biases on the grand jury, and he characterizes this challenge as one based upon principles of equal protection. He posits that when faced with "blacks, guns and drugs," a grand jury will necessarily indict based upon their prejudices, or that we must at least have grave doubts that they had done so. That argument is patently frivolous. Carried to its extreme, it would allow a "free pass" from drug charges for African–American gang members, or for any other ethnic or religious minority substituted for the word "black" above, because a grand jury could never render a fair indictment. Taylor presents no evidence that grand jurors harbor such intense prejudices, or that they are incapable of setting aside any personal biases in the interest of administering justice. He also presents no evidence correlating indictment rates to race or gang affiliation. In fact, his argument is itself based on improper stereotypes, and cannot transform an allegation of error in the presentation of evidence into a challenge to the structural integrity of the grand jury process. The isolated reference to the gang membership, if improper, was thus harmless in this case.

■■■ Taylor also argues that the indictment must be quashed because it is based solely on hearsay testimony. The Supreme Court has held, however, that an indictment may be based entirely upon hearsay testimony. *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956). The validity of an indictment is not affected by the form of the evidence considered, and an otherwise valid indictment cannot be challenged on the ground that the grand jury based it on inadequate or incompetent evidence. *Id.* at 363, 76 S.Ct. 406; *United States v. Doerr,* 886 F.2d 944, 963 (7th Cir. 1989). Therefore, this claim is without merit.

### III.

Taylor also raises a number of issues that are unique to the respective convictions, and we will address the firearms conviction (Appeal No. 971004) first. Taylor argues that this conviction was not supported by sufficient evidence, and that the court erred in enhancing his sentence on the firearms conviction based upon possession of crack cocaine. These contentions are also without merit.

■■■ A challenge to the sufficiency of the evidence can only succeed if the evidence

---

4. We note in passing, however, that immediately following the introduction of that evidence, the government instructed the grand jury to limit its consideration to the evidence presented regarding the search warrant. That statement ameliorated any prejudicial effect that the gang reference may have had.

is insufficient for a rational juror to find guilt beyond a reasonable doubt. *United States v. Duncan*, 896 F.2d 271, 277 (7th Cir.1990). In this case, the evidence of possession is substantial and easily survives an insufficiency challenge. Possession may either be actual or constructive. *United States v. Kitchen*, 57 F.3d 516, 521 (7th Cir.1995). Taylor maintains that he did not live at the searched premises and thus did not possess the firearms even constructively. The evidence at trial, however, indicated otherwise. The police conducted the search of 1614 S. Fellows St. at 7:00 a.m. and found Taylor sleeping at that residence with his girlfriend. The officers also found a number of items in the bedroom in which Taylor slept that indicated he lived there. In a padlocked closet in the bedroom, for example, the police found men's clothes but no women's clothes, a receipt with his name on it, and men's cologne, in addition to the firearms. The police also discovered Taylor's driver's license, a vehicle title certificate, and a hospital billing statement for him, all using that address. In addition, the police ascertained that his pager and his health insurance were obtained with that address listed as his residence. The evidence that Taylor lived at 1614 S. Fellows St. is more than substantial; it is overwhelming. It is a short step under these facts from finding that Taylor lived at the residence to finding that he constructively possessed the weapons found there. The weapons were found in a padlocked closet near the bed in which he slept, and the closet contained only men's clothing and cologne, as well as a receipt with his name on it. The record reveals no evidence of any other man residing at the house. The evidence easily survives a sufficiency challenge.

Taylor also contends that the court erred in enhancing his sentence on the firearms charge by four levels based upon possession of crack cocaine because a jury had not yet convicted him of the possession of crack cocaine charge. He thus maintains that the court violated the due process and double jeopardy clauses by considering that conduct. The Supreme Court has expressly rejected this argument in *United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997), and it is without merit.

**IV.**

With respect to the conviction for possession of cocaine base (Appeal No. 98–1120), Taylor argues that the court erred when it adopted a prior court's order denying his pre-trial motions, refused to allow a polygraph expert to testify, limited the questioning of a witness, and sentenced him under the crack cocaine provisions of the guidelines. We will address these meritless challenges seriatim.

**A.**

Taylor was tried on the possession charge twice, with the first trial ending in a hung jury.[5] He argues that the district court in the second trial erred when it adopted the decision of the first trial court rejecting his motions to dismiss the indictment, quash the search warrant, and suppress the evidence. According to Taylor, that adoption constituted a refusal to consider his motions, and was a denial of due process and an abuse of discretion. This argument is unsupported by the record. In its order denying the motions, the second court noted that the motions had been denied in the first trial by Judge Sharp in an "extensive and thoughtful written order." The court then adopted the reasoning of Judge Sharp in again denying the motions. There is no denial of due process or abuse of discretion in a decision which merely denies a motion based on reasoning expressed initially by another court. The court did not fail to consider the motions; rather, the court considered and rejected them for the same reasons that they had been rejected in the past.

**B.**

Taylor next contends that the court erred when it limited the testimony of certain defense witnesses. In particular, the court refused to allow a polygraph expert to testify regarding the results of a polygraph exam. The court also limited the questioning of another defense witness to exclude questions

---

5. The case was assigned to a different judge, Judge Moody, for the second trial.

which would implicate the witness' right against self-incrimination. We first address the trial court's exclusion of testimony by a polygraph expert for the defense. Taylor's theory of defense was that the drugs actually belonged to his girlfriend, Sheila Gaston. He sought to introduce the testimony of a polygraph expert that Gaston was telling the truth when she declared that the drugs belonged to her. Such testimony was allowed in the first trial, which resulted in a hung jury. After an evidentiary hearing, the district court decided to exclude testimony regarding the polygraph examination in the second trial.

■ We will not reverse a decision regarding the admissibility of expert testimony unless the court abused its discretion. *General Electric Co. v. Joiner,* —— U.S. ——, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Target Market Pub., Inc. v. ADVO, Inc.,* 136 F.3d 1139, 1143 (7th Cir.1998). The record here does not reveal an abuse of discretion. The trial court held that polygraph testing is generally valid when using the probable lie control question technique, which was used by the proffered defense expert here. The court, however, excluded the expert testimony because it determined that the expert's application of the technique in this case was not reliable. First, the court was concerned that the expert appeared to use "stock" questions in the test rather than questions tailored to the circumstances of this case. Second, the expert used a subjective visual scoring technique in calculating the results rather than the more reliable objective numerical scoring system. Finding that those factors lessened the reliability of the test, the court then determined that the probative value of the testimony was significantly outweighed by the danger of unfair prejudice under Rule 403. The reliability problems rendered the probative value minimal according to the district court, and there was a danger that the jury would consider the polygraph test to be conclusive regarding Gaston's veracity. That determination by the court was not an abuse of discretion.

■ The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589–91 & 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), held that the trial court serves the function of a "gatekeeper" to ensure that a jury hears only reliable and relevant expert testimony. Toward that end, the court must consider a number of factors, including the methodology used and the qualifications of the expert. *See Daubert,* 509 U.S. 590–95, 113 S.Ct. 2786; *United States v. Vitek Supply Corp.,* 144 F.3d 476 (7th Cir.1998) (holding that an expert's qualifications bear upon scientific reliability). In making that determination, courts properly consider whether the proffered witness possesses genuine expertise in the field and whether the testimony adheres to the standards of intellectual rigor demanded in the profession. *Tyus v. Urban Search Management,* 102 F.3d 256, 263 (7th Cir.1996). In this case, the polygraph expert testified regarding his significant years of experience as a polygraph examiner. He also testified, however, that he was not familiar with any social science studies of the last three or four years regarding the validation of polygraph technique. Although he was aware that the professional polygraph associations with which he was affiliated had issued written protocols for the administration of the control question technique examination, he had not read any in the past five years. Moreover, he had not taken a course on physiology since "sometime in 1980." With respect to the test of Gaston, the expert produced the standard background questions used in the pretest interview but was unable to provide the court with the questions he asked that were directed to the specific issue for Gaston. With respect to those more individualized questions, he declared that he took some notes but no specific, detailed notes because "[t]hat's the discipline that I utilize." Trial Transcript, March 31, 1997 at 845. Against that background, the district court examined the methodology used in this case. Its concern over the questions asked and the reliability of the "visual scoring method" as opposed to an objective scoring method are not without some basis. The court had significant evidence that this polygraph expert, although experienced in the field, had not remained current on developments in polygraph testing and did not make an effort to update or refine his technique. Given those

questions concerning the reliability of the exam, it was not an abuse of discretion for the court to conclude that the potential for prejudice outweighed the probative value of the examination.

## C.

██ Taylor next complains about the procedure the court followed when a defense witness declared an intent to invoke her right against self-incrimination but that witness also possessed non-privileged information. The defense witness was Paula Patterson, the aunt of Sheila Gaston. Gaston asserted that Patterson provided the crack cocaine to her, and Patterson informed the district court that she intended to assert her Fifth Amendment right against self-incrimination. The district court conducted a hearing to identify which areas of inquiry would trigger Patterson's invocation of her Fifth Amendment right. The court then instructed Taylor not to ask those questions before the jury. The court did allow Taylor to explore areas involving non-privileged information. When Taylor's counsel strayed into areas that would have caused the witness to "take the fifth," the prosecutor objected and the court sustained the objections. Taylor now argues that he should have been allowed to ask those questions, and that the jury should have been able to hear the witness invoke her Fifth Amendment right against self-incrimination. According to Taylor, the refusal of the court to allow the questions "shielded Patterson from a jury determination of her credibility," and left the door open for the government to argue in its closing that the crack cocaine was Taylor's and that he was the supplier for Gaston.

██ Taylor's argument is unavailing for a number of reasons. First, the jury may not properly draw any inference from a person's exercise of her Fifth Amendment right against self-incrimination. *United States v. Harris,* 542 F.2d 1283 (7th Cir.1976). Therefore, even if Taylor asked those questions

and Patterson invoked her Fifth Amendment rights, the jury could not consider that invocation in determining credibility. For the same reason, the government argument at closing would have been unaffected as well. Taylor clearly is contesting the decision precisely because he wanted to use Patterson's invocation of the Fifth Amendment as evidence of her involvement with drugs. The trial judge properly avoided that improper use by precluding the questions at trial.

██ Second, the trial judge was faced with the problem of a defense witness who possessed both privileged and non-privileged information. In this case, the court simply attempted to limit the questioning to non-privileged information. The Sixth Amendment grants the defendant the right to compel a witness' testimony, but that right is not unlimited and does not extend to testimony that is "incompetent, privileged or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois,* 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). Although restrictions on questioning are not an ideal solution, it is difficult to think of any approach that would be better under these circumstances. The judge correctly did not attempt to bar the witness altogether, as is appropriate when the witness will invoke the privilege as to any question put to her. *See United States v. Jeffers,* 532 F.2d 1101, 1114 n. 16 (7th Cir.1976) *aff'd. in part & vacated in part* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977) (trial court properly refused to allow defense to call witnesses who would then refuse to testify on Fifth Amendment grounds; "the impropriety of having the jury exposed to such suggestive non-testimony overrides any possible benefit"). The court instead attempted to limit the questions to non-privileged areas, while preventing the jury from hearing the invocation of the Fifth Amendment privilege and drawing any inferences therefrom.[6] Taylor does not argue that the selective nature of the questioning in this case would itself prejudice him because the jury, expecting the hard-

---

**6.** The reverse situation, in which the non-privileged information is heard and the witness invokes the Fifth Amendment privilege in front of the jury for select questions, has also been the subject of court challenges, so Taylor's preferred

approach is also subject to problems. *See Namet v. United States,* 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963) (no error under the circumstances of this case in allowing witness to invoke the Fifth Amendment for some questions).

hitting questions, would draw adverse inferences against him when the questions are not asked. In this case, Taylor asked a number of questions regarding Gaston's use of drugs and Patterson's knowledge of it. The court sustained the government's objections to the questions, so the jury would not attribute the failure to explore the subject to Taylor. Furthermore, he does not assert that due process required the government to grant immunity to Patterson in order for him to obtain her testimony. *See United States v. Herrera–Medina*, 853 F.2d 564, 568 (7th Cir. 1988). Therefore, the trial judge did not err in limiting the questions to non-privileged information.

### D.

▇ The final challenge asserted by Taylor is that the court erred in sentencing him based upon possession of crack cocaine. He contends that the evidence at trial established the presence of cocaine base, but did not necessarily establish that the cocaine base was in the form of crack cocaine. Therefore, he argues, he should not have been sentenced under the enhanced provisions for possession of crack cocaine.

In *United States v. Adams*, 125 F.3d 586, 592 (7th Cir.1997), we recognized that the Sentencing Guidelines impose an enhanced penalty only for the form of cocaine base which is "crack." Specifically, the guidelines state:

"Cocaine base," for the purposes of this guideline, means "crack." "Crack" is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form.

U.S.S.G. § 2D1.1(c)(D). Therefore, we held that the government must prove by a preponderance of the evidence that a defendant possessed "crack" cocaine in order to enhance the sentence under that provision. *Id.* In this case, sufficient evidence exists to prove that the form of cocaine base possessed by Taylor was "crack." First, a chemist for the Indiana State Police testified that she analyzed the substance and identified it as containing cocaine base, and that

she knew cocaine base by its slang term "crack." Thus, she appeared to be limiting the term "cocaine base" to "crack," as does this guideline. This interpretation was furthered when she compared the substance with cocaine in its powder or salt form, and noted that this cocaine base was in a "hard rock-like form" with a very high level of purity. The trial reveals numerous references in which witnesses characterized the substance found as "crack" cocaine, from the police officer to defense witnesses. In fact, the defense expert on drug trafficking stated that the substance appeared to be crack cocaine. In sum, there was sufficient evidence to conclude by a preponderance that the cocaine base in this case was "crack." Accordingly, the court did not err in sentencing Taylor under that provision.

### V.

For the above reasons, the decisions of the district courts in both cases are AFFIRMED.