# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

              v.

EARL ANTHONY NEVILS, a/k/a EARL
NEVILS, JR., EARL BOWMAN; EARL
JOHNSON, ALFRED JOHNSON,
"BABYCRIPTOE", "LILAMIGO" and
"BABY FROG,"
          *Defendant-Appellant.*

No. 06-50485

D.C. No.
CR-03-01269-CBM

OPINION

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

Argued and Submitted
December 3, 2007—Pasadena, California

Filed November 20, 2008

Before: Thomas G. Nelson, Richard A. Paez, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Paez;
Dissent by Judge Bybee

15691

**COUNSEL**

Elizabeth A. Newman, Assistant Federal Public Defender, Los Angeles, California, for the defendant-appellant.

Sandy N. Leal, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

**OPINION**

PAEZ, Circuit Judge:

Earl Nevils appeals from a jury conviction for being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1). We reverse the conviction because the evidence offered at trial was insufficient with regard to the element of knowing possession.[1]

---

[1]Because we reverse Nevils's conviction, we need not address his challenge to his sentence.

## I.   BACKGROUND

On April 14, 2003, LAPD officers specializing in anti-gang enforcement were investigating unrelated criminal activity at an apartment complex in a high-crime area of Los Angeles when they encountered Earl Nevils asleep on a couch in one of the apartments (Apartment 6). The officers were originally following another man because he ran away when they approached him and his friends on the street. As they followed the man into the courtyard of the apartment complex, he approached Apartment 6, started to enter, and then apparently changed his mind and entered another apartment on the other side of the courtyard. When the officers approached Apartment 6 to investigate, their attention was diverted from the other man to Nevils.

The wooden door of Apartment 6 was off its hinges and leaning against the interior wall, and the metal security door, or screen door, was ajar. Inside, the officers could see Nevils asleep on a couch. Leaning against Nevils's body were two firearms—one on his lap and another leaning against his leg. There was a coffee table approximately one foot from the couch. On the table were several items that the police later determined to be baggies full of marijuana and ecstasy, a cell phone, wrist watches, documents, and U.S. currency.

The police officers entered the apartment with guns drawn, conducted a "sweep," and then began to approach Nevils. As they approached, Nevils began to wake up. At that point, both officers identified themselves and yelled for Nevils to get down on the ground. Nevils either "rolled" or "slid[ ]" onto the ground, and the officers arrested Nevils for drug possession. Both officers testified that Nevils "startled" awake. One officer testified more specifically that, before Nevils's rolled or slid onto the ground, "his eyes . . . kind of came full — fully opened and for a brief second he appeared like he was going to, you know, grab towards his lap and then he stopped and put his hands up." The other officer did not mention any

brief pause; he stated that the events were "very quick" and "almost immediate," and that Nevils "jumped up as a startled jump and rolled over onto the ground." Some time after the arrest, a sergeant who had arrived on the scene was questioning Nevils to make sure he was not injured, when Nevils stated: "I don't believe this shit. Those motherfuckers left me sleeping and didn't wake me." Nevils was later booked on charges of possession of marijuana for sale.

Nevils was later charged and tried in federal court on a single count of being a felon in possession of a firearm and ammunition. The Government's case consisted primarily of the testimony of the two arresting officers setting forth the incriminating circumstances surrounding Nevils's arrest. In his defense, Nevils presented evidence that he had been at a party in a neighboring apartment all day, had become so drunk that he could not stand, and was taken by friends to Apartment 6 and laid on the couch (on his side "[s]o he wouldn't throw up") to sleep it off. Jonnetta Campbell, who helped take Nevils to Apartment 6, testified that at the time she left Nevils on the couch and closed the door behind her, there were no other people in Apartment 6, and no guns or drugs were visible. It was undisputed at trial that Nevils did not live in Apartment 6 and that many other people had access to the vacant apartment, although Nevils was the only person present when the police entered.

At the close of the Government's case and again at the close of all the evidence, Nevils moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal on the basis of insufficiency of the evidence. The district court denied both motions, and the jury found Nevils guilty.

Nevils timely appealed.[2] He argues that the evidence was insufficient on the element of knowing possession. Nevils points out that: (1) it is undisputed that he was asleep; (2) a

---

[2]We have jurisdiction under 28 U.S.C. § 1291.

witness offered unrebutted testimony that he had gotten drunk at a nearby party and had been taken to Apartment 6 to lie down; and (3) no evidence—other than his presence—tied Nevils to the firearms, or to the other items found in the apartment (i.e., the drugs, the cell phone, the watches, and the U.S. currency).

The Government argues that the evidence of knowing possession was sufficient because: (1) Nevils had "actual possession" of the firearms due to his physical contact with them; (2) there was evidence that Nevils had been in Apartment 6 at least once before; (3) Nevils's "gang affiliation . . . support[ed] the jury's finding that [he] knowingly possessed the firearms"; (4) Nevils "appeared like he was going to . . . grab towards his lap" when he was awakened by the police; and (5) Nevils made statements showing consciousness of guilt.

## II.   DISCUSSION

We review de novo the denial of a Rule 29 motion. *United States v. Esquivel-Ortega*, 484 F.3d 1221, 1224 (9th Cir. 2007). In considering a challenge to the sufficiency of the evidence, we review the entire record, "[v]iewing the evidence in the light most favorable to the government," and "must determine whether any rational jury could have found [the defendant] guilty of each element of the crime beyond a reasonable doubt." *Id.* We do not "question [the] jury's assessment of witnesses' credibility, and must presume that the trier of fact resolved any conflicting inferences in favor of the prosecution." *United States v. Johnson*, 229 F.3d 891, 894 (9th Cir. 2000) (internal quotation marks and footnote omitted). Applying this standard, as we explain below, the evidence was insufficient as a matter of law to support Nevils's conviction, and we therefore reverse and remand for entry of a judgment of acquittal.

## A.    Elements of an 18 U.S.C. § 922(g)(1) offense

[1] The crime charged, being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), requires proof of three elements: "(1) that the defendant was a convicted felon; (2) that the defendant was in knowing possession of a firearm; and (3) that the firearm was in or affecting interstate commerce." *United States v. Beasley*, 346 F.3d 930, 933-34 (9th Cir. 2003). The first element was conceded by stipulation, and the third was not contested. The only disputed element at trial was Nevils's knowing possession of the firearms.[3]

[2] Proof of knowing possession in the context of 18 U.S.C. § 922(g)(1) requires "that the defendant consciously possessed what he knew to be a firearm." *Id.* at 934. "In general, a person is in possession of something if the person knows of its presence *and* has physical control of it, or has the power and intention to control it."[4] *United States v. Cain*, 130 F.3d 381, 382 (9th Cir. 1997) (emphasis in original) (internal quotation marks omitted); *see also United States v. Ruiz*, 462 F.3d 1082, 1088 (9th Cir. 2006) ("Possession of an item includes the ability and intent to exercise control over that item.").

[3] "[T]he element of control necessary for possession [is not] satisfied if it [i]s shown that the defendant was merely 'in the presence of the contraband and could reach out and take it' if he so desired." *United States v. Chambers*, 918 F.2d 1455, 1459 (9th Cir. 1990) (quoting *United States v. Terry*,

---

[3]The indictment also alleged possession of ammunition, but it was undisputed that the ammunition in question was loaded inside the firearms. The sufficiency analysis is thus identical with regard to both the ammunition and the firearms.

[4]This formulation is almost identical to that provided by our Circuit's model jury instructions. *See* Ninth Circuit Manual of Model Jury Instructions, Criminal § 3.18 ("Possession—Defined") (2003 ed.) ("A person has possession of something if the person knows of its presence and has physical control of it, or knows of its presence and has the power and intention to control it.").

911 F.2d 272, 280 (9th Cir. 1990)). Rather, "[w]e have held repeatedly that neither proximity to the contraband, presence on property on which contraband is recovered nor association with a person having actual possession of the contraband is sufficient proof of . . . possession." *Id.* (collecting cases). "Mere proximity, presence and association go only to the contraband's *accessibility*, not to the dominion or control which must be proved to establish possession." *Id.* (emphasis in original) (internal quotation marks omitted).

**[4]** Possession can be either actual or constructive. *See, e.g.*, *Chambers*, 918 F.2d at 1457-58. The Government argues that this case is an "actual" or "physical" possession case, and that "constructive" possession cases discussing "mere proximity" therefore do not apply. The tenuous distinction between "actual" and "constructive" possession, however, is not analytically useful in this case. *See* Ninth Circuit Manual of Model Jury Instructions, Criminal § 3.18 ("Possession— Defined"), cmt. (2003 ed.) (stating that instruction quoted above at note 4 is "all-inclusive" and that "[t]here is no need to attempt to distinguish further between actual and constructive possession"); *cf. Nat'l Safe Deposit Co. v. Stead*, 232 U.S. 58, 67 (1914) ("[A]ctual possession and constructive possession . . . often so shade into one another that it is difficult to say where one ends and the other begins."). Ultimately, possession—of whatever type—requires a showing that Nevils had knowledge of the firearms and the ability and intention to control them. Accordingly, rather than attempting to sort this case as an "actual" or "constructive" possession case, we focus on the dispositive requirements of knowledge and ability and intention to control.

## B.   Sufficiency of the evidence of possession

**[5]** Noting that Nevils was alone in Apartment 6 when he was arrested, the Government argues that "a rational trier of fact could find that the physical location of the firearms on defendant's lap and leaning against his leg, as well as the

presence of packaged drugs, a cell phone, and money within a foot from where defendant lay, constituted possession of the firearms. In short, the jury was entitled to rely upon his actual possession of the firearms to infer that his possession was knowing." The Government argues that the "mere proximity" cases cited above are irrelevant because here the firearms were actually touching Nevils's body. But the pivotal circumstance in this case is the undisputed fact that *Nevils was asleep* (or passed out). Thus, the fact that the firearms were physically touching him is not sufficient to show that he was conscious of their presence, and the "mere proximity" cases are quite relevant.

**[6]** The Government is correct that, had Nevils been caught running with a gun in his hand—or sitting on top of a gun (while awake), *see United States v. Gutierrez*, 995 F.2d 169 (9th Cir. 1993)—the jury would be entitled to make an inference of knowledge, and the mere proximity cases would be superfluous. Because Nevils was asleep, though, this is not a paradigmatic "actual" possession case, and additional evidence is necessary to allow an inference of knowledge. That the weapons were touching Nevils is a factor tending to make knowing possession more likely, but without evidence that Nevils was aware of their presence, this fact is not enough. *See Chambers*, 918 F.2d at 1459 ("[P]roximity . . . go[es] only to the contraband's *accessibility*, not to the dominion or control which must be proved to establish possession." (emphasis in original) (internal quotations omitted)).

In *Gutierrez*, for example, proximity was coupled with the facts that: (1) the defendant—who was awake—was "sitting on top of a pistol" in the back seat of a car; (2) the police testified that the car's occupants appeared to be hiding things as they approached; and (3) the corner of the back seat appeared to have been "hastily" torn back to conceal the weapon. 995 F.2d at 171-72 (noting that "testimony that the defendant may have placed something in the spot where the police later

found the weapon can support a finding of possession" (internal quotation marks omitted)).

Similarly, in *United States v. Taylor*, 154 F.3d 675 (7th Cir. 1998), the court affirmed a conviction for possession of a firearm where evidence that the defendant was sleeping in the same room as the firearm was accompanied by additional evidence tying him to the apartment. There was "overwhelming" evidence that Taylor lived in the apartment, and "[t]he weapons were found in a padlocked closet near the bed in which he slept, and the closet contained only men's clothing and cologne, as well as a receipt with his name on it." *Id.* at 682. Moreover, "[t]he record reveal[ed] no evidence of any other man residing at the house." *Id. See also United States v. Castillo*, 866 F.2d 1071, 1086-88 (9th Cir. 1988) (affirming conviction for possession of cocaine on similar facts, where defendant had keys to apartment, defendant was sleeping in locked bedroom where cocaine was found, and defendant's clothes were found in bedroom closet).

On the other hand, in *Ruiz*, we reversed convictions under § 922(g)(1) because the defendants' ties to the firearms and the premises where they were found (a methamphetamine lab operated on property on which several buildings stood) were too undefined. 462 F.3d at 1090. Ruiz and codefendant Noriega—both of whom admitted participating in a criminal drug conspiracy on the property—were observed fleeing the premises during a police raid, and "firearms were found in the loft area, in the main part of the residence, in the garage and in the stairwell of the main part of the residence." *Id.* at 1088. In reversing the convictions, we stated: "The most that can be said in favor of a finding of possession of the firearms is that Diaz, one of the co-conspirators, resided on the premises where the drugs were found, and that Noriega and Ruiz both had access to the residence. However, access to the premises does not equate to possession." *Id.* at 1089. We noted that "there was no evidence . . . regarding a finite number of identified individuals who had access to the subject premises." *Id.*

We also rejected "the [Government's] argument that 'somebody must have possessed the weapons because they were there' [as] insufficient evidence of control or intent to control the weapons by one or more identified individuals." *Id.*

[7] None of the above cases is precisely on all fours with our case, because of the special circumstance that the guns were actually on or leaning against Nevils's body as he slept. Nevertheless, despite the close physical proximity of the guns to Nevils, the fact remains that the circumstantial evidence of knowledge and intent to control here falls far short of that found sufficient in cases like *Castillo* or *Taylor*. The Government did not offer evidence tying Nevils to any of the other personal items in the apartment,[5] as in *Taylor*, and it did not offer any evidence that Nevils's access to Apartment 6 was exclusive. Not only did the Government fail to offer "evidence . . . regarding a finite number of identified individuals who had access to [Apartment 6]," *Ruiz*, 462 F.3d at 1089, it was unable to rebut evidence that there was open access to Apartment 6. Nor did the Government establish suspicious behavior by Nevils similar to the defendants scrambling to hide the guns in *Gutierrez. See Gutierrez*, 995 F.2d at 171.[6]

The Government argues that "[h]ere, unlike *Ruiz*, witness testimony not only links defendant to the firearms and [Apart-

---

[5]A forensic officer testified that it was not possible to lift fingerprints from the guns, and that the items on the coffee table were not tested for fingerprints. The arresting officers testified that they did not recover ammunition, drugs, money, or keys to Apartment 6 from Nevils's person.

[6]As noted above, here one officer testified that, immediately after being awoken from a drunken stupor by screaming officers, Nevils "for a brief second . . . appeared like he was going to, you know, grab towards his lap." On appeal, the Government cites this testimony as evidence that Nevils was aware of the firearms' presence. At trial, the Government did not make any similar argument to the jury. In any case, unlike the specific evidence of " 'furtive' movements" in *Guttierez*, the officer's speculative and diffident testimony here is not the type of consciousness-of-guilt evidence on which a reasonable juror could rely.

ment 6], but defendant was in actual possession of both loaded firearms, and he was the only person in the apartment." First, this argument bootstraps by assuming the proposition—actual possession—that it must prove. Second, the Government fails to acknowledge that the defendants in *Ruiz* were also directly linked to the subject premises. Among other things, the *Ruiz* defendants were observed fleeing the premises, admitted participating in a meth-production conspiracy on the premises, and admitted having access to the premises. Finally, the Government fails to acknowledge that, although Nevils was the only person in Apartment 6 *when the police entered*, the evidence (1) established that other people generally had access to the apartment, and (2) strongly suggested—based on the various personal effects found on the coffee table—that other people had been in the apartment before the police arrived.

In *Ruiz*, there was no question that the defendants were at the subject premises, frequently, and were up to no good. The relevant question was whether there was specific evidence to show that they were *aware* of the weapons' presence and had the *intent* and ability to control the weapons. Similarly, here there is no doubt that Nevils was in Apartment 6, or that he had been there once before, allegedly up to no good (he was arrested there several weeks earlier for violating his parole by associating with gang members). The question was whether there was sufficient evidence to allow a finding that he had knowledge of, and the intent and ability to control, the firearms. The Government claims that the officers' observation of Nevils—admittedly, asleep—with one gun on top of him and the other next to his leg was sufficient to support a finding of possession. But this argument amounts to little more than the argument rejected in *Ruiz*—that "somebody must have possessed the weapons because they were there." 462 F.3d at 1089.

The Government did not present any other evidence linking Nevils to the guns or to the other items in Apartment 6 (the

drugs, the phones, etc.). Further, Nevils was only slightly linked to the apartment itself, having been there at least one other time. Finally, as in *Ruiz*, and unlike in *Taylor*, there was no reason to believe that Nevils regularly stayed in Apartment 6, much less that he had exclusive access to the apartment. To the contrary, there was every reason to believe that the apartment was open to all comers.

**[8]** Nor does Nevils's gang affiliation, familiarity with the apartment complex, or Nevils's prior experience with drugs provide sufficient evidence to support an inference *that he was in knowing possession of a firearm on April 14, 2003*. Nevils's mere presence at the scene and his general character and history as a gang member are insufficient evidence of the required mental state. *See Spivey v. Rocha*, 194 F.3d 971, 978 (9th Cir. 1999).

In short, there is little to distinguish this case from cases like *Ruiz*, other than the physical proximity of the firearms to Nevils. If the firearms in this case had been found on the coffee table—along with the drugs, cell phone, watches, U.S. currency, and documents—there is no doubt that a judgment of acquittal would be required, as no other evidence tied Nevils to the firearms or the apartment, other than his presence in the apartment on one other occasion. *See, e.g.*, *Ruiz*, 462 F.3d at 1088-89. Indeed, the district court here did not hesitate at sentencing to find that the Government had failed to prove—even by a preponderance of the evidence—that Nevils possessed the drugs on the coffee table. In declining to make such a finding, the district court emphasized that Nevils "was asleep at the time."

The sufficiency of the Government's evidence thus depends on the distinction between the guns being found on the coffee table and their being found on and leaning against Nevils's body as he slept. Despite the Government's insistence that the distinction itself is enough to demonstrate Nevils's "actual possession" of the firearms, possession—

whether labeled actual or constructive—requires *knowledge* of the object possessed *and intent* to control that object. Knowledge and intent obviously require consciousness, at some point. There was no direct evidence showing that Nevils was ever conscious in Apartment 6 on April 14, 2003. All of the evidence presented indicated that he was asleep and/or passed out. The circumstantial evidence bearing on Nevils's mental state was similar to that we have repeatedly rejected as insufficient. *See, e.g.*, *Esquivel-Ortega*, 484 F.3d at 1226-27; *Ruiz*, 462 F.3d at 1088-89; *United States v. Corral-Gastelum*, 240 F.3d 1181, 1184 (9th Cir. 2001). *Cf. United States v. Vasquez-Chan*, 978 F.2d 546, 551 (9th Cir. 1992) (noting that we have held "evidence legally insufficient to establish possession when the evidence suggested that a defendant was merely caught in 'extremely incriminating circumstances' ").

**[9]** "When there is an innocent[7] explanation for a defendant's conduct as well as one that suggests that the defendant was engaged in wrongdoing, the government must produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that the latter explanation is the correct one." *Vasquez-Chan*, 978 F.2d at 549; *see also Esquivel-Ortega*, 484 F.3d at 1227-28. Here, the Government did not produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that Nevils was guarding the drugs or otherwise consciously in possession of the guns, as opposed to being passed out at the wrong place, at the wrong time.

---

[7]Innocence in this instance is used in a narrow sense. The question is not whether the defendant was innocent of all wrongdoing, but whether the inference in question renders him legally innocent of the crime charged. For example, if a defendant was charged with possession of a shotgun found in the trunk of a car he was driving, evidence that (1) the defendant had stolen the car only minutes before being pulled over, and (2) the shotgun was registered to the car's rightful owner, would support an "innocent" inference that the defendant lacked the requisite knowledge to be convicted *of possessing the shotgun.*

Although Nevils's proffered explanation might seem implausible in many towns and many apartment complexes, *cf. United States v. Perlaza*, 439 F.3d 1149, 1177 (9th Cir. 2006) ("[This court] will accept a defendant's allegedly 'innocent explanation' only when that explanation is plausible."), it is not implausible given the evidence that *this* neighborhood, *this* apartment complex, and Apartment 6 itself, were neck-deep in gang activity and the illicit drug trade. Further, the presence of several watches, a cell phone, other personal items, and drugs packaged for retail sale—none of which were tied to Nevils—supports the inference that other people were in Apartment 6 before the police arrived.

Finally, we reject the Government's reliance on Nevils's post-arrest statement as supporting a jury inference of knowing possession. The statement "[t]hose motherfuckers left me sleeping and didn't wake me" is ambiguous and is subject to multiple interpretations, and the Government did not produce evidence sufficient to allow a jury to choose an inculpatory interpretation. The Government argues that "the most reasonable inference . . . from this statement was that defendant was angry that his friends failed to warn him . . . something he expected them to do because he knew he was illegally in possession of guns and drugs." To the contrary, the statement merely demonstrates Nevils's mastery of the obvious: some person or persons (1) had been in Apartment 6, and then (2) absconded and left him surrounded by the incriminating evidence. The fact that Nevils realized he had been left high and dry, and was not happy about it, is hardly incompatible with his innocent explanation of his circumstances (i.e., that he was asleep), and it does not show that Nevils had knowledge of the firearms *before being arrested*.

**[10]** Because there was a plausible innocent explanation for the facts, the Government was required to "produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that [an inculpatory] explanation [was] the correct one." *Vasquez-Chan*, 978 F.2d at 549. Here—given the lack

of any corroborating details connecting Nevils to the guns or the other items in the apartment, combined with the very slight evidence connecting Nevils to Apartment 6, and the evidence that Apartment 6 was essentially accessible to the public—the Government has not provided evidence that would allow a rational jury to conclude beyond a reasonable doubt that Nevils knew, prior to awaking, of the firearms' presence and had the intention to exercise control over them.

### III. Conclusion

Nevils could not be convicted for his mere sleeping presence in Apartment 6 during criminal activity by others, and he also could not be convicted of a violation of § 922(g) based on "mere presence" even if he were, at some point, awake and aware that others were committing crimes involving guns and drugs in the apartment. The Government did not produce sufficient evidence beyond evidence of "mere presence" and gang affiliation. The undisputed evidence established that Nevils was asleep when the police arrived. On this record, we hold that the Government failed to produce evidence that would have allowed a rational jury to infer knowing possession beyond a reasonable doubt. It may be natural to assume that "somebody must have possessed the weapons because they were there," *Ruiz*, 462 F.3d at 1089, but the Government did not offer sufficient evidence to prove that that "somebody" was Nevils.

**REVERSED and REMANDED for entry of a judgment of acquittal.**

---

BYBEE, Circuit Judge, dissenting:

It is said that the wife of English lexicographer Samuel Johnson returned home unexpectedly in the middle of the day, to find Dr. Johnson in the kitchen with the chambermaid. She

exclaimed, "My dear Dr. Johnson, I am surprised." To which he reputedly replied, "No my dear, you are amazed. We are surprised."[1]

Earl Nevils was surprised when two LA police officers with guns drawn ordered him not to move. But Nevils was not amazed in the least by the circumstances in which he found himself: he had a loaded, chambered semiautomatic Tec 9 on his lap and a loaded, chambered .40 caliber pistol by his leg. Nor was he astonished by the marijuana, ecstasy, cash and a cellphone on a table a foot away. Although the unoccupied apartment was not his, Nevils wasn't the least bewildered at finding himself in Apartment #6—officers had found drugs and guns in the apartment just three weeks earlier and had arrested Nevils there for parole violation. According to one of the officers, Nevils first impulse was to "grab towards his lap" where the Tec 9 lay and "then he stopped and put his hands up." He later exclaimed to an officer, "I don't believe this s---. Those m------------left me sleeping and didn't wake me." The jury found him guilty of being a felon in possession.

The majority overturns his conviction because it finds the evidence insufficient to show that Nevils knowingly possessed the guns. It surmises that it is equally plausible that someone—anyone, actually, since the defense couldn't finger any person in particular—set Nevils up by placing the guns on him while he was in a drunken stupor. Thus, the majority concludes, no reasonable juror—certainly not the twelve who did —could have found that Nevils knowingly possessed the guns. Like Mrs. Johnson, I am both amazed and disappointed. I respectfully dissent.

I

To overturn a jury's conclusion that evidence introduced in a trial was sufficient to convict the defendant we must, as the

---

[1]The story has occasionally been attributed to Noah Webster.

majority admits, "determine whether any rational jury could have found [the defendant] guilty of each element of the crime beyond a reasonable doubt." *United States v. Esquivel-Ortega*, 484 F.3d 1221, 1224 (9th Cir. 2007). Under this inquiry, we must not "question [the] jury's assessment of witnesses' credibility, and must presume that the trier of fact resolved any conflicting inferences in favor of the prosecution." *United States v. Johnson*, 229 F.3d 891, 894 (9th Cir. 2000). This standard is extraordinarily high. It means that to overturn a jury conviction based on sufficiency of evidence, the majority must conclude that *no rational jury* could have convicted Nevils under the evidence properly presented at trial. *United States v. Barron-Rivera*, 922 F.2d 549, 552 (9th Cir. 1991).

In this case, for the purposes of 18 U.S.C. § 922(g), the jury had to find that the defendant had "knowing possession" of a firearm; that is, the jury must have concluded that Nevils "consciously possessed what he knew to be a firearm." *United States v. Beasley*, 346 F.3d 930, 934 (9th Cir. 2003). This conscious possession can either be actual or constructive, *see United States v. Chambers*, 918 F.2d 1455, 1457-58 (9th Cir. 1990), but in either case the government must prove "a sufficient connection between the defendant and the [firearms] to support the inference that the defendant exercised dominion and control over the [firearms]." *Gutierrez*, 995 F.2d at 171 (quoting *United States v. Terry*, 911 F.2d 272, 278 (9th Cir. 1990)). There is a "sufficient connection" in this case.

There was ample circumstantial evidence for a rational jury to conclude that Earl Nevils knew he possessed, at the least, the 9mm Luger semi-automatic handgun (also referred to in the record as a Tec 9) on his lap. The gun was loaded with several live rounds of ammunition, including one in the gun's chamber. The jury heard evidence from which it could easily have inferred that Nevils knew the gun was there. Officer Clauss, one of the two police officers who apprehended Nevils, testified that when they came upon Nevils and

announced themselves, "at that point, you know, his eyes, you know, kind of came full—fully opened and for a brief second he appeared like he was going to, you know, grab toward his lap and then he stopped and put his hands up." A rational juror could equally infer from Nevils' behavior that his first instinct was to reach for his weapon—an instinct that was suppressed when Nevils realized the officers had already drawn their guns and one of the officers had flanked him. Nevil's subsequent behavior is consistent with the jury's finding. When he talked to Sergeant Coleman after his arrest, Nevils did not express any consternation over waking up in a strange place, or amazement about finding guns on his person. He didn't say "Hey, how did I get here?" or "Where did those guns come from?" Instead, he simply expressed anger over being left alone, proclaiming, "I can't believe this s---. Those m------------ left me sleeping and didn't wake me."

## II

The majority rejects these perfectly plausible explanations because it finds another explanation in equipoise with the government's case and relies on the rule that where the evidence presented at trial does not "establish any reason to believe that an innocent explanation of that evidence was any less likely than the incriminating explanation advanced by the government," it cannot establish the defendant's guilt beyond a reasonable doubt. *United States v. Vasquez-Chan*, 978 F.2d 546, 551 (9th Cir. 1992). The majority's "innocent explanation" in this case, however, is extraordinarily implausible. The defense's theory, adopted by the majority, is that Nevils, after arriving at the apartment complex for a baby shower, became drunk, passed out, and was carried into the notorious Apartment #6 by several female friends. He then remained unconscious for some seven hours (from approximately 4:00 or 5:00 p.m., a few hours after the baby shower ended, until around 11:45 p.m., when the police officers entered the apartment complex). During that period, one or more persons, whose identities and reasons are unknown, entered Apartment #6,

placed drugs in small baggies, a cell phone, and cash on the coffee table in front of Nevils and left a loaded semiautomatic handgun on Nevils' lap and another loaded pistol leaning against his leg. This activity, apparently, did not wake the lethargic Nevils. Instead, the majority believes, he continued to sleep soundly until the police arrived, was awakened, and was amazed to find himself surrounded by drugs and guns.

Even more curious than Nevils' behavior under the majority's "innocent explanation" is the behavior of the anonymous drug dealers. What did the drug dealers do? There are a couple of options, none of them very good. As Mark Twain wrote, "[i]t would take you thirty years to guess, and even then you would have to give it up." Mark Twain, *Fenimore Cooper's Literary Offenses*, *in* In Defense of Harriet Shelley and Other Essays 60, 68 (1918). These drug dealers, according to one version of the theory, were surprised by the presence of a police car outside the apartment complex, got scared, and ran off. They decided it was best to leave their drugs and weaponry with the sleeping Nevils, and either threw or placed the heavy guns unto Nevils' lap and leg (all without waking him) as they rushed to leave the premises. Although ordinary drug dealers might, with an eye towards profits, stuff the drugs, cash, and cellphones in their pockets while they were leaving, the majority's anonymous constructs are no ordinary drug dealers. Instead, these guys were so frightened of being caught by the police that they left all their loot on the coffee table, ran out the front door of the apartment, and disappeared before the police arrived. Ironically, their haste did not appear to be necessary—the police officers saw no one leaving Apartment #6 and were only drawn to the apartment after noticing a person furtively trying to enter it later.

Alternatively, the drug dealers deliberately decided to leave their paraphernalia in the apartment. But rather than leave one of their number behind to guard the loot, they set up a scarecrow of sorts—arming the unconscious Nevils and propping

him up on the couch to look menacing. This plan, of course, was foiled by the arrival of the police, who weren't impressed with the sleeping Nevils. This theory, like the first, is so far-fetched that a rational jury could easily have rejected it in favor of the far more plausible conclusion that Nevils simply fell asleep while guarding the drugs.

The majority recognizes that its theory is implausible "in many towns and many apartment complexes." Maj. Op. at 15706. But it finds that its "innocent explanation" is "not implausible given the evidence that *this* neighborhood, *this* apartment complex, and Apartment 6 itself, were neck-deep in gang activity in the illegal drug trade." *Id.* In other words, the alternate theory would be implausible if Nevils had been found in an ordinary apartment complex, but because this was a notorious drug area, *anything* can happen. The majority's admission that its theory is generally implausible is healthy, but it can't make its implausible theory plausible just because these events took place in a drug-infested area. No one—not even drug dealers, and maybe *especially* drug dealers—are going to go off and abandon their loaded weapons, drugs, cash and cellphones with a man sleeping off a drunken binge. It makes no sense whatsoever. If we are to assume, without any evidence, that people are that irrational, then we are going to have to revise our "innocent explanation" jurisprudence and overturn a bunch of our cases.

### III

We don't have any cases that address precisely how much the government must prove to show that a sleeping defendant is a knowing possessor. The two cases that are closest to this case come to opposite conclusions and each is distinguishable. The majority relies principally on *United States v. Ruiz*, 462 F.3d 1082 (9th Cir. 2006). In that case, the defendants were arrested following a raid on a meth lab in a house. The officers found weapons in a couch in the loft area, in the main part of the residence, in a stairwell and under a sofa cushion

in the garage. *Id.* at 1085. Other than the defendants' mere presence at the house, nothing linked them to the weapons; there was no fingerprint evidence and they did not own the residence. *Id.* at 1088. Our decision is a model of common sense: although the men were present in a dwelling where weapons were found, there is nothing to show that they knowingly possessed the weapons. Like the defendants in *Ruiz*, Nevils did not own Apartment #6, nor were his fingerprints found on the gun. However, unlike in *Ruiz*, where the defendants were simply present in the same house as the weapons, here Nevils had the weapons on his person, and they were loaded and chambered.

Our decision in *United States v. Gutierrez*, 995 F.2d 169 (9th Cir. 1993), is closer to this case. In that case, the police stopped a car on a possible traffic violation. After taking the driver for a sobriety test and determining that the remaining two men did not possess a valid driver's license, the police decided to tow the car. The officers discovered a loaded firearm under the left rear seat, where Gutierrez had been sitting. Acknowledging that " 'mere presence as a passenger in a car from which the police recover weapons does not establish possession,' " we found that "there was much more than 'mere proximity' or 'mere presence" in the car. *Id.* at 171 (quoting *United States v. Soto*, 779 F.2d 558, 560 (9th Cir. 1986)). Rather, "[i]t would tax credulity to assert that Gutierrez was sitting on top of a pistol without knowing of its presence, or that he just happened to be a passenger in an automobile equipped with a pistol for each passenger, and the he knew nothing of that odd coincidence." *Id.* If the majority applied its "innocent explanation" theory to *Gutierrez*, we would have deemed the evidence insufficient in that case. In *Gutierrez*, we might have easily said that Gutierrez's explanation sounded implausible, but in *this* car, in *this* neighborhood, and with *this* defendant, anything was possible— including the possibility that Gutierrez was sitting in the back seat of a car with a loaded pistol under it and didn't know it.

If the guns had been found elsewhere in the apartment, Nevils would have a good claim under *Ruiz*. If the guns were found on the table, the case would be a close one. The majority, however, has no *plausible* explanation—certainly nothing with a shred of evidence to support it—for how Nevils ends up with a loaded semiautomatic on his lap and a pistol against his leg.

Because the majority's "innocent explanation" "tax[es] credulity," *Gutierrez*, 995 F.2d at 171, a reasonable juror could find Nevils had control of the guns. I would affirm the district court's determination that the evidence was sufficient to convict Nevils of knowing possession of the weapons. Thus, I respectfully dissent.